**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

IBRAHIMA CAMARA,                          :
                                          :
    *Petitioner*,                       :
                                          :   Case No. 1:25-cv-740
                                          :
v.                                        :
                                          :   Judge Jeffery P. Hopkins
                                          :   Magistrate Judge Peter B. Silvain, Jr.
FIELD OFFICE DIRECTOR FOR                 :
ENFORCEMENT AND REMOVAL                   :
OPERATIONS DETROIT,                       :
                                          :
    *Respondent*.                       :

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

Like the estimated hundreds of thousands of unauthorized and undocumented European migrants who entered the United States during the twentieth century,[1] with its promise of a fresh start, Petitioner Ibrahima Camara ("Petitioner" or "Camara") came to this country undoubtedly to find work and pursue the American Dream. But unlike those who came before and who were very often afforded an easier pathway to citizenship, Camara fell short of his goal, and while awaiting deportation, and after following all the conditions of supervised release, including since 2007, periodically checking-in with immigration authorities, he now finds himself arrested and detained in an American jail for the past six months, away from his American family without being told why, nor being given an opportunity to plead for his release with the government agency holding him, *sine die*. In response to his detention, Camara filed this unverified Petition for Writ of Habeas Corpus,

---

[1] *See* HIDDEN HISTORIES OF UNAUTHORIZED MIGRATIONS FROM EUROPE TO THE UNITED STATES (Danielle Battisti & S. Deborah King eds., 2025).

on October 14, 2025, pursuant to 28 U.S.C. § 2241. Doc. 1. Respondent Robert K. Lynch, who is named in his official capacity as Director of Enforcement and Removal Operations for the U.S. Immigration and Customs Enforcement Field Office in Detroit within the United States Department of Homeland Security (the "Respondent" or "ICE"), filed a Return of Writ on November 19, 2025. Doc. 9. Attached to Respondent's Return is an affidavit of Suha Peng, a Deportation Officer with the Columbus Sub Office of Enforcement and Removal Operations ("ERO") for ICE. *See* Doc. 9-l. Camara filed a Reply to Respondent's Return, on November 26, 2025. Doc. 10. Additionally, on December 4, 2025, this Court issued an Order directing Respondent to address three discrete issues. Doc. 11. Respondent filed its Response on December 18, 2025. Doc. 12. The matter is now ripe for determination.

Because Camara's detention, now in excess of six months, is unlikely to result in his removal in the reasonably foreseeable future, Petitioner is being detained in violation of the Due Process Clause of the United States Constitution and the Petition for habeas corpus relief (Doc. 1) is **GRANTED**.

## I.  BACKGROUND AND PROCEDURAL POSTURE

Petitioner Camara says that he is a fifty-five-year-old citizen of Mauritania (officially the Islamic Republic of Mauritania located in Northwest Africa) and that he entered the United States more than twenty-five years ago. *See* Petition, Doc. 1, ¶ 12. According to ICE officials, Camara entered the United States, on or about August 13, 1998, at Miami, Florida, without being inspected or admitted. Peng Decl., Doc. 9-1, ¶ 4. After entering this country, Camara applied for but was denied asylum and ordered removed by the Immigration Judge ("IJ") assigned to hear his case on November 28, 2000. Camara unsuccessfully appealed the Immigration Judge's decision to the Board of Immigration Appeals ("BIA") on February 11,

2003. Doc. 12, PageID 88. Thereafter, on June 23, 2004, the Sixth Circuit upheld the BIA's order to remove Camara from the country. Peng Decl., Doc. 9-1, ¶¶ 10–11; *see also Camara v. Ashcroft*, 102 F. App'x 950, 952 (6th Cir. 2004). Subsequently, in 2007, Camara was released on an Order of Release on Supervision ("OSUP"), referred to herein as "supervised release," under 8 U.S.C. § 1231(a)(3). Petition, Doc. 1, ¶¶ 13–14; Peng Decl., Doc. 9-1, ¶ 12.

On January 2, 2014, Camara's supervised release was extended, and he was directed to report back to the ICE offices on March 6, 2014. Pet'r Ex. A, Doc. 10-1, PageID 62. Since Camara was initially placed on supervised release, he has remained in the United States where he has been consistently gainfully employed; married to a United States citizen (for the past eighteen years); and, with his wife, raising five children, all United States citizens, two of whom are minors. Petition, Doc. 1, ¶¶ 17–19. Since Camara's supervised release in 2007, ICE has not attempted to arrest or re-detain him. Since there is no mention of it by ICE in its pleadings, the Court assumes that Camara has not committed any criminal acts while in this country, and at present, Camara does not have any criminal charges pending against him. Petition, Doc. 1, ¶ 17.

On September 3, 2025, Camara's peaceful living in the U.S. ended abruptly,. During a routine check-in appointment with the immigration office, ICE agents arrested Camara and placed him in custody at the Butler County Correctional Complex where he has remained for approximately the past six months. Petition, Doc. 1, ¶ 15; Peng Decl., Doc. 9-1, ¶¶ 3, 13. After his arrest, on September 5, 2025, ICE issued Camara a Warning for Failure to Depart (also known as form I-229(a)), which he signed. Doc. 12, PageID 88. The form I-229(a) instructed Camara to assist in complying with enforcement of the February 11, 2003, removal order. *Id*. Four days later, on September 9, 2025, ICE notified Camara that he was going to

3

remain in detention until ICE could effectuate his removal from the United States. Resp't Ex. B, Doc. 12-2, PageID 106. The notice also informed Camara that if he was not removed within 90 days, his custody would be reviewed by "ICE's Deciding Official" to determine if he would be released on an Order of Supervision or if detention would continue. *Id.*

On September 17, 2025, ICE Enforcement and Removal Operations ("ICE-ERO") submitted a request to Camara's home country of Mauritania seeking travel documents for his return. Peng Decl., Doc. 9-1, ¶ 14. An additional two months passed without any response from Mauritania to the ICE-ERO's request for travel authorization for Camara. Then, on November 24, 2025, ICE issued a notice to Camara that his detention would continue beyond the 90-day period because ICE "expects to receive the necessary travel documents to effectuate [his] removal." Resp't Ex. C, Doc. 12-3, PageID 109. Ironically, however, Camara himself had made that same request of his native country, Mauritania, for travel documents in 2016, 2017, and 2018 without success.

These requests were made well before the ICE-ERO's more recent request for travel authorization, on September 17. Doc. 10, PageID 60; Pet'r Ex. B, Doc. 10-2; Pet'r Ex. C, Doc. 10-3; Pet'r Ex. D, 10-4. In the more than six months that have now passed since Camara's detention on September 3, the country of Mauritania has yet to issue travel documents to Camara. It is against this backdrop that Camara now presents his Petition for habeas corpus relief asking that this Court order his immediate release from detention and reinstatement of the terms of supervised release under the previous conditions that had been imposed by ICE in 2007—and that, in the eighteen years since, Camara had not violated.

## II.    LAW AND ANALYSIS

It is well settled that: "The Privilege of the Writ of Habeas Corpus shall not be

suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., Art I, § 9, cl. 2. The constitutional guarantee of the writ of habeas corpus is "available to every *individual* detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2) (emphasis added). To preserve the right of the people to obtain relief under this Clause, Congress enacted 28 U.S.C. § 2241. Section 2241 confers on federal district courts the power to issue writs of habeas corpus to persons held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. This authority also includes challenges made by noncitizens in immigration-related detention matters. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

To contest his detention as unconstitutional, Camara asserts two main arguments. First, Camara asserts that ICE violated the Due Process Clause of the Fifth Amendment, because his detention is not authorized by 8 U.S.C. § 1231(a)(6) and that his detention was effectuated by ICE in violation of its own regulations, namely 8 C.F.R. § 241.4(l). Petition, Doc. 1, ¶¶ 25, 29, 59–60. Second, even if the detention was initially effectuated in a legally permissible manner, Camara asserts that the Due Process Clause of the Fifth Amendment, as interpreted by the Supreme Court in *Zadvydas*, requires his immediate release and reinstatement of the conditions of supervision which had been earlier imposed by ICE, given that his actual removal to the country of Mauritania is not "reasonably foreseeable." *Id.* ¶ 76 (quoting *Zadvydas*, 533 U.S. at 699–700).

In the Return of Writ, Respondent asserts three main points. First, Respondent trots out the often tried and nearly just as often unsuccessful argument that this Court lacks subject matter jurisdiction to even consider this matter under 8 U.S.C. § 1252(g). Doc. 9, PageID 35. Second, Respondent claims that Camara was afforded adequate due process when ICE

detained him on September 3, 2025, even though ICE officials have yet to give any reason why Camara's supervised release was revoked. *Id.* at PageID 42. Finally, Respondent claims that the Supreme Court's holding in *Zadvydas* does not compel release, because ICE's request to Mauritania for travel documents for Camara—now more than six months into his detention—makes his removal reasonably foreseeable. *Id*.

### A. Jurisdiction

The Court begins by addressing the threshold question of jurisdiction. "[F]or over a 100 years, habeas corpus has been recognized as the vehicle through which noncitizens may challenge the fact of their detention." *Malm v. Adduci*, 452 F. Supp. 3d 643, 649 (E.D. Mich. 2020) (citing *Chin Yow v. United States*, 208 U.S. 8, 13 (1908)). ICE claims that 8 U.S.C. § 1252(g), as interpreted by the Sixth Circuit in *Rranxburgaj v. Wolf*, 825 F. App'x 278 (6th Cir. 2020), strips federal district courts like this one of habeas jurisdiction in the context of challenges to removal orders. Doc. 9, PageID 35. While an accurate statement of the law, Respondent's argument fails to persuade. The holding in *Wolf* is inapposite to the case currently before the Court. Here, Camara seeks to challenge his *detention* by ICE, not the validity of the order to *remove* him from the United States.

The Sixth Circuit in *Wolf* held that federal courts lack jurisdiction to consider habeas petitions pertaining to denial of a stay of deportation (removal action). *Wolf*, 825 F. App'x at 283. However, the Sixth Circuit elsewhere has held that "the district court's jurisdiction over the detention-based claims is *independent* of its jurisdiction over the removal-based claims." *Hamama v. Adducci*, 912 F.3d 869, 877 (6th Cir. 2018) (emphasis added); *accord Mingrone v. Adducci*, No. 2:17-cv-11685, 2017 WL 4909591, at *8 (E.D. Mich. July 5, 2017) (noting that determinations of unlawful detention are separate from challenging removal; a detainee's

challenge to detention "need not show that proceeding with his removal is improper (he could be released [from detention] and ICE could still proceed to remove him)").

A petition for writ of habeas corpus under 28 U.S.C. § 2241 "is appropriate for raising statutory and constitutional challenges to post-removal detention by ICE." *Estenor v. Holder*, No. 1:11-cv-743, 2011 WL 5572596, at *2 (W.D. Mich. Oct. 24, 2011) (citing *Zadvydas*, 533 U.S. at 688; *Ly v. Hansen*, 351 F.3d 263, 266 (6th Cir. 2003)), *report and recommendation*, *adopted*, 2011 WL 5589279 (W.D. Mich. Nov. 16, 2011). Thus, contrary to Respondent's argument, courts in this Circuit have consistently recognized the authority of district courts to hear unlawful detention claims brought by immigration detainees. *See, e.g.*, *Touray v. Lynch*, No. 1:25-cv-683, 2025 WL 2778271, at *3 (S.D. Ohio Sept. 30, 2025) (explaining courts "have jurisdiction to review challenges to detention" in a post-removal context); *Karki v. Jones*, No. 1:25-cv-281, 2025 WL 1638070, at *8 (S.D. Ohio June 9, 2025) (also finding proper jurisdiction over a detention-based claim in a post-removal context).

Here, again, Camara is challenging the legality of his current *detention* and not the legitimacy of ICE's order that he be removed. *See* Petition, Doc. 1, PageID 15–16 (requesting a declaration that Respondent's "actions to arrest and detain [him] violate the Due Process Clause of the Fifth Amendment"). As a result, this case falls squarely within the ambit of § 2241's grant of authority allowing a district court to hear and decide in the context of a habeas corpus petition a post-removal detention claim by an immigrant alleging a violation of the Due Process Clause of the Constitution.

### B. Due Process

Having concluded that this Court has jurisdiction to hear and determine Camara's habeas corpus Petition, the Court must next decide if his current detention violates the

Constitution's Due Process Clause. The Supreme Court "has held that the Due Process Clause protects an alien subject to a final order of deportation." *Zadvydas*, 533 U.S. at 693–94. Among the fundamental requirements of due process are ones that mandate that an individual be afforded notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The role that a district court must play to ensure that even the rights of noncitizens being detained by our government under our Constitution are also quite clearly prescribed: "We live in a country where the Rule of Law is paramount, and it is the province of the federal judiciary to ensure that the government obeys the law, particularly when it chooses to deprive someone of their liberty." *Mbonga v. Raycraft*, 809 F. Supp. 3d 762, 765 (N.D. Ohio 2025).

### 1.    ICE's Failure to Comply with Regulations

One of the bases upon which Camara claims that his detention violates Due Process rests upon his contention that ICE did not follow its own regulations when they detained him on September 3, 2025; that he was not provided with notice of the reasons for the revocation of his supervised release; and, that he was denied an informal interview promptly after his detention without an opportunity to respond. Respondent does not refute these facts. Instead, ICE contends that revocation of an order of release of a noncitizen, like Camara, is not required because he is being *re*-detained pursuant to 8 C.F.R. § 241.4(l)(2), and that the notice and informal interview requirements set forth under 8 C.F.R. § 241.4(l)(1) pertain only to those noncitizens who violate the conditions of their supervised release orders. Doc. 12, PageID 93. According to ICE, requiring notice and an informal interview for those with a removal order already in place who have not violated their conditions of release "results in re-litigation of the alien's removal orders." *Id.*

The Court does not find Respondent's argument very persuasive. Instead, this Court finds more persuasive the decision by the district court in *Constantinovici v. Bondi*, 806 F. Supp. 3d 1155 (S.D. Cal. 2025). When confronted with the revocation of a supervised release order by ICE of a noncitizen, the district court in *Constantinovici*, while construing the intricate statutory framework governing ICE, said this:

> Section 1231 governs the arrest and detention of noncitizens who have been ordered removed. This statute directs the Attorney General of the United States to effect the removal of a noncitizen from this country "within a period of 90 days," also known as the "removal period." It also authorizes detention of the noncitizen during this removal period. However, once that time passes and after "removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute," and the noncitizen must be released. *Zadvydas*, 533 U.S. at 699–700; *see* 28 U.S.C. § 1231(a)(3) ("If the alien does not leave or is not removed within the [90-day] removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General.").

*Constantinovici*, 806 F. Supp. 3d at 1162 (cleaned up).

To add clarity to its construction of the statute, the *Constantinovici* court went on to layout the regulatory framework as follows:

> The Government has promulgated regulations in the Code of Federal Regulations concerning the release of noncitizens who are subject to a final removal order. *See* 8 C.F.R. § 241.4; 8 C.F.R. § 241.13. These regulations also govern the revocation of such noncitizens' release. Both 8 C.F.R. § 241.4(l)(1) and § 241.13(i)(3) provide that, upon revocation of release, the noncitizen "will be notified of the reasons for revocation of his or her release," and will be given "an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification."

*Id.*

Here, however, Respondent provides no authority for its assertion that ICE needn't adhere to the interpretation of the applicable statutes and regulations espoused by the *Constantinovici* court. In fact, Respondent candidly acknowledges that "district courts in the

Sixth Circuit, and the majority around the United States, have concluded that the notice and informal interview provisions in § 241.4(l)(1) apply to revocations under section 241.4(l)(2)(iii)." Doc. 12, PageID 96 (citing *Constantinovici*, 806 F. Supp. 3d at 1164; *Mbonga*, 809 F. Supp. 3d at 768; *K.E.O. v. Woosley*, No. 4:25-cv-74, 2025 WL 2553394 (W.D. Ky. Sept. 4, 2025)). *See also Fajardo v. Raycraft*, No. 1:25-cv-1529, 2025 WL 3649522, at *5 (W.D. Mich. Dec. 17, 2025) ("The Court, therefore, agrees with courts around the country in concluding that the failure to provide Petitioner with notice of revocation and an informal interview promptly after his detention with a meaningful opportunity to contest the reasons for revocation in accordance with 8 C.F.R. § 241.4 and § 241.13 violates Petitioner's right to due process under the Fifth Amendment and requires release.").

Under the circumstances, the Court finds unpersuasive Respondent's argument that the revocation of a noncitizen release order who has not violated any of the conditions imposed "results in re-litigation of the alien's removal orders." Doc. 12, PageID 93. This argument fails for several reasons. First, ICE makes the same error here that it made in its jurisdictional arguments. The requirement that ICE must give notice of the reasons for re-detaining a noncitizen and provide him or her with an informal interview and an opportunity to respond is related to the act of detaining the noncitizen. The opportunity for notice, like the opportunity to respond, afforded the noncitizen by the statute and regulations in these situations is independent of the validity of the removal order. The very existence of this proceeding illustrates the case-in-point. A circumstance may arise where an order of removal is completely valid, but an order of detention pursuant to that order is not.

Second, Respondent's argument would create an inexplicable gap in the regulatory scheme. As clearly noted by the district court in *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 164

10

(W.D.N.Y. 2025), when rejecting a similar argument raised by ICE, that court held:

> Under the government's interpretation of the regulation, someone arrested based on the revocation of an order of supervision not related to a violation of conditions might spend three months or more in custody before getting *any* opportunity to contest the person's detention. So a noncitizen suspected of violating a condition of release gets more process than a noncitizen—like [Petitioner]—who has met his obligations to report. And someone arrested in error—perhaps a citizen mistaken for a noncitizen—might be jailed for months without any chance to contest the mistake. That cannot be—and is not—the law.

*Ceesay*, 781 F. Supp. 3d at 164.

A similar point was made by the court in the Northern District of Ohio in *Mbonga*, previously cited in this decision. There, the court stated succinctly that "it does not make sense that someone who does not violate the conditions of their release would be afforded less procedural safeguards than someone who does." *Mbonga*, 809 F. Supp. 3d at 768. Respondent's argument ignores the purpose of the notice and opportunity to be heard requirements and the *new* restriction of liberty occasioned by the termination of an order of supervision. "Even if ICE has discretion to revoke a noncitizen's release under of § 241.4(l)(2), the noncitizen's liberty interests are still implicated by his or her re-detention." *Constantinovici*, 806 F. Supp. 3d at 1164. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

Nor is the Court persuaded by Respondent's lack of prejudice argument. ICE contends that this Petition should be denied even if ICE violated its own regulations because it claims Camara was not prejudiced by the violation. Doc. 12, PageID 99. According to ICE "any deprivation of process by the Government's failure to follow its regulatory procedures [was] harmless." *Id.* (quoting *Karki v. Raycraft*, No. 2:25-cv-13186, 2025 WL 3516782, at *7 (E.D.

11

Mich. Dec. 8, 2025)). *See Strickland v. Washington*, 466 U.S. 668, 692 (1984). However, as the district court in *K.E.O.* recently reiterated, "prejudice may be presumed when 'compliance with the regulation is mandated by the Constitution' and 'where an entire procedural framework, designed to ensure the fair processing of an action affecting an individual is created but then not followed by an agency.'" *K.E.O.*, 2025 WL 2553394, at *5 (quoting *Delgado-Corea v. I.N.S.*, 804 F.2d 261, 263 (4th Cir. 1986)).

Numerous district courts, including many in the Sixth Circuit, have recognized that "when the government promulgates regulations 'with the force and effect of law,' agencies are bound to follow their own 'existing valid regulations.'" *Mbonga*, 809 F. Supp. 3d at 768 (quoting *United States v. Accardi*, 347 U.S. 260, 265–68 (1954) and ordering the petitioner's release where the government failed to comply with § 241.4(l)(1) & (2)). *See also K.E.O.*, 2025 WL 2553394, at *7 (same); *Constantinovici*, 806 F. Supp. 3d at 1165–66 (finding that because the petitioner's detention violated due process, respondents were ordered to release the petitioner "subject to his preexisting Order of Supervision").

Additionally, the Court is not persuaded by Respondent's suggestion that the issuance of a form I-229a, Warning for Failure to Depart, or the Notice to Alien of File Custody Review—neither of which state the *reasons* for the revocation of his supervised release order—satisfy the required notice and informal interview requirements of the regulations. November 25, 2025, Decision to Continue Detention also does not state the reason for the revocation of Petitioner's supervised release order. *See* Doc. 12, PageID 94–95; Resp't Ex. A, Doc. Docs. 12-1; Resp't Ex. B, Doc. 12-2; Resp't Ex. C, Doc. 12-3.

The determination that ICE's failure to follow its own regulations violated Petitioner's Due Process rights under the Fifth Amendment comports with holdings of other courts across

12

the country. *See e.g.*, *Fajardo*, 2025 WL 3649522, at *5 ("[T]he failure to provide Petitioner with notice of revocation and an informal interview promptly after his detention with a meaningful opportunity to contest the reasons for revocation in accordance with 8 C.F.R. § 241.4 and § 241.13 violates Petitioner's right to due process under the Fifth Amendment and requires release."); *Constantinovici*, 806 F. Supp. 3d at 1165–66 (finding that because the petitioner's detention violated Due Process, respondents were ordered to release the petitioner "subject to his preexisting Order of Supervision"); *Ceesay*, 781 F. Supp. 3d at 166 ("[B]ecause ICE did not follow its own regulations in deciding to re-detain [Petitioner], his due process rights were violated, and he is entitled to release."); *Rombot v. Souza*, 296 F. Supp. 3d 383, 388 (D. Mass. 2017) ("Based on ICE's violations of its own regulations, the Court concludes [Petitioner's] detention was unlawful."); *M.S.L. v. Bostock*, No. 6:25-cv-01204, 2025 WL 2430267, at *12 (D. Or. Aug. 21, 2025) (ordering release where "ICE failed to follow its own regulations in detaining Petitioner" and therefore "violated Petitioner's constitutional due process rights"); *Grigorian v. Bondi*, No. 25-cv-22914, 2025 WL 2604573, at *10 (S.D. Fla. Sept. 9, 2025) ("The failure to provide Petitioner with an informal interview promptly after his detention or to otherwise provide a meaningful opportunity to contest the reasons for revocation violates both ICE's own regulations and the Fifth Amendment Due Process Clause. This compels Petitioner's release."); *Ghafouri v. Noem*, No. 3:25-cv-02675, 2025 WL 3085726, at *6 (S.D. Cal. Nov. 4, 2025) (ordering release where "ICE deprived Petitioner of his due process rights and prejudiced his interests by failing to afford him the procedural safeguards the regulations were designed to protect"). Since ICE failed to follow its own regulations in re-detaining Camara, and since that failure violated Petitioner's Due Process rights under the Fifth Amendment, he is subject to release.

13

**2.      Due Process Prohibits Indefinite Detention of Removable Noncitizens**

Having determined that ICE has been detaining Camara for the better part of six months and failed to provide him with notice, an informal interview, and an opportunity to respond under 8 C.F.R. § 241.4(l)(1) and 8 U.S.C. § 1231(a)(6), the Court must now decide whether Camara's removal is unlikely in the reasonably foreseeable future.

In the Petition for habeas corpus, Camara reiterates that before his detention, and while residing in the United States under supervised release since 2007, he has held valid work authorization papers, paid taxes, and provided for his family. Petition, Doc. 1, ¶ 18. Camara further contends that his continued detention deprives his United States citizen wife of eighteen years and their five United States citizen children of his companionship and income. *Id.* ¶ 19. Camara asks the Court to declare that "[ICE's] actions to arrest and detain [him] violate the Due Process Clause of the Fifth Amendment." Doc. 1, PageID 15. He also asks the Court for an order of "immediate release from ICE custody under appropriate supervision pursuant to 8 U.S.C. § 1231(a)(3)." *Id.*

ICE, on the other hand, does not contest that Camara has fully complied with all the conditions imposed under its supervised release order. *See* Doc. 12, PageID 93. Instead, ICE maintains it is authorized to keep Camara in detention, because the "ICE ERO expects [Camara] will be removed in the reasonably foreseeable future," citing the affidavit of Suha Peng, a Deportation Officer for ICE. *See* Doc. 12 PageID 3, ¶ 4; Peng Decl., Doc. 9-1, ¶¶ 14–17; Resp't Ex. C, Doc. 12-3, PageID 109. Camara counters by asserting that his detention is illegal under *Zadvydas*, 533 U.S. 678, because his removal from the United States to Mauritania is not reasonably foreseeable. ICE maintains that Camara's *Zadvydas* argument is not well founded and speculative at best.

The statute relevant to this discussion can be found under 8 U.S.C. § 1231. Section 1231(a)(1)(A) and (a)(2) governs post removal requests by noncitizens once their requests for asylum have been adjudicated and denied. In relevant part, 8 U.S.C. § 1231(a)(1)(A) and (a)(2) provide that once a noncitizen has been ordered to be removed from the United States, "the Attorney General shall detain the alien" and "remove the alien from the United States within a period of 90 days."

Consistent with this procedure, 8 U.S.C. § 1231(a)(6) further explains under what circumstances noncitizens subject to removal may be detained and provides that:

> An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the [90-day] removal period.

By its very terms, § 1231(a)(6) "applies to three categories of noncitizens: (1) those ordered removed who are inadmissible under § 1182, (2) those ordered removed who are removable under § 1227(a)(1)(C), § 1227(a)(2), or § 1227(a)(4), and (3) those ordered removed whom the Secretary [of the Department of Homeland Security (DHS)] determines to be either a risk to the community or a flight risk."[2] *Clark v. Martinez*, 543 U.S. 371, 377 (2005).

---

[2] The Court notes that two of the three categories under § 1231(a)(6) are inapplicable here. Under category one, Camara was not found to be inadmissible under § 1182. Likewise, category three does not apply because Camara has not been identified as either a risk to the community or flight risk by Immigration and Customs Enforcement. *See* Doc. 12-3, PageID 109. However, category two applies. Camara entered the United States on or about August 13th, 1998. Peng Decl., Doc. 9-1, ¶ 4. In 2007, Immigration and Customs Enforcement placed Camara on an Order of Supervision, allowing him to remain in the United States. *Id.*, ¶ 12, Doc. 10-1, PageID 62. However, Camara's supervision was revoked on September 3, 2025, and he was taken into custody. Peng Decl., Doc. 9-1, ¶ 13. Pursuant to § 1227(a)(1)(C)(i), upon revocation of the supervised release order, Camara was deemed to no longer have permission to remain in the United States. *See Matovski v. Gonzales*, 492 F.3d 722, 738 (6th Cir. 2007) (§ 1227(a)(1)(C)(i) applies when a noncitizen remains "in the United States longer than permitted after admission as a nonimmigrant visitor.").

In *Zadvydas*, the Supreme Court interpreted these provisions "to authorize the Attorney General (now the Secretary [of DHS]) to detain aliens in the second category only as long as 'reasonably necessary' to remove them from the country." *Clark*, 543 U.S. at 377 (quoting *Zadvydas*, 533 U.S. at 689, 699). In *Zadvydas*, the Supreme Court held that reading § 1231(a)(6) to authorize *indefinite* detention would "raise a serious constitutional problem" under the Fifth Amendment's Due Process Clause. *Zadvydas*, 533 U.S. at 690. Thus, the Court "construe[d] the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review." *Id.* at 682. According to *Zadvydas*, six months following the initial 90-day detention period is a "presumptively reasonable period of detention." *Id.* at 701.

Finally, the Supreme Court noted in *Zadvyda*s that "[t]he six-month presumption of reasonableness [for post-removal detention] is merely a tool to 'guide lower court[s]' in making those 'determinations.'" *Munoz-Saucedo v. Pittman*, 789 F. Supp. 3d 387, 397 (D.N.J. 2025) (quoting *Zadvydas*, 533 U.S. at 701). And as one district court recently stated, "[i]mportantly, *Zadvydas* unequivocally held that 'once removal is no longer reasonably foreseeable, continued detention is no longer authorized.'" *Gomez-Simeon v. Bondi*, No. 25-cv-1460, 2025 WL 3470872, at *3 (W.D. Tex. Nov. 24, 2025) (quoting *Zadvydas* 533 U.S. at 699–700). In other words, "[t]he Supreme Court in *Zadvydas* did not explicitly preclude a noncitizen from challenging his detention prior to the end of the presumptively reasonable six-month period." *Hoang Trinh v. Homan*, 333 F. Supp. 3d 984, 994 (C.D. Cal. 2018).

When Camara was detained on September 3, 2025, ICE did not have travel documents for him to be removed to Mauritania. Now, over six months later, ICE still has no travel documents for Camara, despite an official request to the country of Mauritania coming from

ERO, an official arm of the United States government. In the Return of Writ, Respondent points to the Declaration of ICE Deportation Officer Suha Peng, claiming that it evinces proof that some progress at securing the necessary travel documents for Camara's return Mauritania has been made. Peng testified that the government requested travel documents for Camara from Mauritania on September 17, 2025, and that "ICE has successfully removed individuals to Mauritania, and there is no reason to believe that ICE will be unable to continue doing so." Peng Decl., Doc. 9-1, ¶¶ 14–15. However, in its response to an Order from this Court directing ICE to "provid[e] additional details, including available documents, on the steps and/or progress the government has made to secure travel documents or otherwise facilitate the removal of Petitioner from the United States to Mauritania," ICE has not produced any evidence to substantiate its claim that Camara's removal and safe return to Mauritania is "reasonably foreseeable." Doc. 11, PageID 85–86; Doc. 12.

Respondent cites the Northern District of Ohio's decision in *Zhen v. Doe* for the proposition that mere "requests for travel documents [by ICE] support a finding of reasonably foreseeable removal." *See Zhen v. Doe*, No. 3:25-cv-01507-PAB, 2025 WL 2258586, at *11 (N.D. Ohio Aug. 7, 2025). However, based on the record presented in this case, the Court finds Respondent's reliance on *Zhen* misplaced. Here, the facts more closely resemble those where courts have taken a different approach. *See Masheli v. Noem*, No. 1:25-cv-1577, 2026 WL 177591, at *3 (W.D. Mich. Jan. 22, 2026); *Mbonga*, 809 F. Supp. 3d 762, 764–65 (N.D. Ohio 2025). In *Masheli*, for example, a decision handed down earlier this year, a district court in Michigan determined that prior unsuccessful attempts at removal based on an order rendered in 2007 created "good reason to believe" that removal in the "reasonably foreseeable future" was, at the very least, unlikely, given the government's "assertion that a travel

17

document ha[d] been requested more than five months [from the date of the petitioner's arrest and detention]." *Masheli*, 2026 WL 177591, at *3 (quoting *Zadvydas*, 533 U.S. at 701). Under the facts presented in that case, the court determined that the government had not produced sufficient evidence to overcome the petitioner's initial showing that it was unlikely that he would be removed in the reasonably foreseeable future, five months after being detained. *Id.* at *4. Similarly, in *Mbonga*, that court was unpersuaded by the testimony of an ICE Official who claimed that detention of the petitioner was proper because travel documents "could be obtained." *Mbonga,* 809 F. Supp. 3d at 767 ("[T]he same argument—that travel documents could be obtained—could be said about anyone in the country subject to an order of removal.").

We begin with the proposition that Camara has the burden initially of providing a "good reason to believe" that no such likelihood of removal in the reasonably foreseeable future exists. *Zadvydas*, 533 U.S. at 701.Once that burden has been satisfied, Respondent must proffer evidence sufficient to rebut the showing. *Id*. Here, the evidence of record demonstrates that Camara on three separate occasions, going back as far as ten years ago, made three unsuccessful attempts to acquire travel documents to return to Mauritania—in 2016, 2017, and 2018. Doc. 10, PageID 60; Pet'r Ex. B, Doc. 10-2; Pet'r Ex. C, Doc. 10-3; Pet'r Ex. D, 10-4. Importantly, here, also, in 2018, the Embassy of Mauritania denied Camara's application for a passport in the absence of an official document titled a "Judgment of Parentage," from a judge in Mauritania. Pet'r Ex. D, Doc. 10-4. Thus, Camara, like the petitioner in *Masheli*, has demonstrated "good reason to believe" that removal in the "reasonably foreseeable future" is very unlikely. *Masheli*, 2026 WL 177591, at *3 (quoting *Zadvydas*, 533 U.S. at 701). In the *Zhen* case, unlike here, there was an absence of proof that

18

the petitioner had made any unsuccessful attempts to acquire travel documentation needed to return to China, her country of origin, for fear that she would be persecuted upon her return. *See generally Zhen*, 2025 WL 2258586. As such, a showing by the government in *Zhen*—that the petitioner had failed to request and thus had not obtained travel documents—was sufficient to satisfy the government's evidentiary burden.

This Court concludes that the decision in *Masheli*, however, more closely aligns with the facts presented in this case. The record shows that ICE requested travel documents for Camara to return to Mauritania on September 17, 2025, and has yet to receive them from that country going on six months later. Moreover, Camara has shown that he has made a substantial effort to obtain travel documents for his return to Mauritania on at least three prior occasions without success and that at no fault to him, his removal is unlikely in the "reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. On the other side, Respondent has failed to meet its burden of rebutting Camara's showing that there is a "good reason to believe" that he will not be removed in the "reasonably foreseeable future." *Zadvvadas*, 533 U.S. at 701.

A declaration from an ICE agent stating that "ICE has successfully removed individuals to Mauritania, and there is no reason to believe that ICE will be unable to continue doing so," hardly rebuts proof offered by Camara that his removal in the reasonably foreseeable future is very unlikely—six months into his detention at the Butler County jail and after ICE requested travel documents from Mauritania back on September 17, 2025—or in Camara's case, as far back as eight years ago in 2018, when his application for a passport was rejected for failing to produce an official document titled a "Judgment of Parentage." *See* Peng Decl., Doc. 9-1, ¶¶ 14–15 and Pet'r Ex. D, Doc. 10-4. Under these circumstances, the

Court concludes that removal is no longer reasonably foreseeable, and Camara's continued detention by ICE is no longer sustainable under the precedent established by the Supreme Court in *Zadvydas*. *See Masheli*, 2026 WL 177591, at *3; *Munoz-Saucedo*, 789 F. Supp. 3d at 397 (granting release prior to six months of detention where "Petitioner sufficiently established that his removal is not reasonably foreseeable and that his detention has exceeded that 'period reasonably necessary to secure [his] removal.'") (quoting *Zadvydas*, 533 U.S. at 699–700)); *see also Mbonga*, 809 F. Supp. 3d at 767 ("Given [Petitioner's] history of compliance and the fact that the travel documents had not been secured, his immediate detention was unnecessary.").[3]

## III.    CONCLUSION

Because Camara's detention violates his rights to Due Process under the Fifth Amendment to the United States Constitution, his Petition for a Writ of Habeas Corpus (Doc. 1) is **GRANTED**. Respondent is **ORDERED** to immediately release Petitioner from custody, subject to his preexisting Order of Supervision, and to certify compliance with this Order by filing on the docket no later than one day after the filing of this Order.

**IT IS SO ORDERED.**

March 19, 2026

Jeffery P. Hopkins
United States District Judge

---

[3]    Because the Court has sufficient grounds to order release, it need not consider Petitioner's additional claim that the ICE official who revoked his supervised release order lacked authority to do so.